[Cite as *Godoy v. Total Quality Logistics, L.L.C.*, 2023-Ohio-4585.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| DARIO GODOY, | : | |
| Appellant, | : | CASE NO. CA2022-01-003 |
| | : | O P I N I O N |
| - vs - | | 12/18/2023 |
| | : | |
| TOTAL QUALITY LOGISTICS, LLC, | : | |
| Appellee. | : | |


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2019 CVH 00362


Lewis Brisbois Bisgaard & Smith, and Daniel A. Leister and Kate L. Kennedy, for appellant.

Dinsmore & Shohl, and Matthew J. Wiles, for appellee.


**HENDRICKSON, P.J.**

{¶ 1} Plaintiff-appellant, Dario Godoy, appeals a decision of the Clermont County Court of Common Pleas granting summary judgment to defendant-appellee, Total Quality Logistics, LLC ("TQL"). For the reasons detailed below, we affirm the trial court's decision.

### I. Facts and Procedural History

{¶ 2} Godoy owns a trucking company (D.O.G. Transport) in California. In 2016, Godoy became a carrier for shipping broker TQL. Godoy executed TQL's standard Broker-

Carrier Agreement (the "Agreement") in which he agreed to become one of TQL's carriers and to transport cargo loads for its customers. The Agreement functioned as a master agreement, applying to all transactions between the parties while the Agreement was in effect.

{¶ 3} The Agreement imposes several duties on a carrier regarding cargo loads. The Agreement provides that the carrier is "fully responsible and liable" for the cargo from the moment the trailer is loaded until the cargo is successfully delivered. A load that needs refrigeration—commonly called a "reefer" load—requires the carrier to ensure that the reefer unit on the trailer is set to a specified temperature and set to run on "continuous" mode, which maintains a more constant temperature in the trailer, as opposed to "cycle" mode, which results in a more varied temperature. The carrier may not assign responsibility or liability to anyone else. The carrier is obligated to indemnify TQL and its customer for any claims or liability arising out of or related in any way to the carrier's negligence, willful misconduct, acts, omissions, or performance or failure to perform under the Agreement, including for claims or liability for cargo loss and damage. Further, if a loss or damage claim associated with a load is filed against TQL, TQL has the right to offset the claim with the amount owed to the carrier to cover the claim. If that amount is not sufficient to cover the claim, the Agreement gives TQL the right to further offset the claim with unpaid amounts owed to the carrier for other loads.

{¶ 4} The Agreement contains a forum-selection clause providing that any dispute arising out of the Agreement must be brought in the Clermont County Court of Common Pleas. Another clause provides that the prevailing party in any lawsuit is entitled to all reasonable expenses, attorney fees, and costs.

{¶ 5} Certain transaction-specific terms were agreed to separately and were incorporated into the Agreement. These terms were specified in a "TQL Rate Confirmation"

that was generated for each load. This was an agreement between TQL and the carrier to transport a particular load at a particular rate and contained information about the particular load.

{¶ 6} Godoy transported a number of loads for TQL without incident. In late 2017, he agreed to transport a reefer load of ice cream in the Los Angeles, California, area for TQL's customer Halo Top Creamery. On November 10, 2017, Godoy was to pick up 2,025 cases of ice cream from a warehouse and deliver them to a Walmart store a couple of hours away. The TQL Rate Confirmation sheet for the load required the reefer temperature to be set at -20 degrees Fahrenheit on continuous mode. The rate for the load was $600.

{¶ 7} Godoy arrived at the warehouse on November 10 by 5:00 p.m. His reefer was set to -19 degrees and was set on cycle mode. When the ice cream was loaded onto his trailer, it was frozen to -20 degrees. It took 30-60 minutes to load the ice cream. Godoy then drove to the Walmart store, arriving around 8:00 p.m. After arriving, he docked his trailer and was told to wait. Godoy left the load and waited inside.

{¶ 8} Two hours later, Walmart told Godoy that it was rejecting the entire load because the temperature was too high and some of the ice cream in his trailer was melted. Godoy notified TQL that the load had been rejected and was told to bring the ice cream back to the warehouse. There it was offloaded and put back in a freezer.

{¶ 9} Later analysis of the data generated by the reefer that day showed that it had been turned off at 5:56 p.m., before Godoy had arrived at Walmart. So there was no refrigeration occurring at all after that time. There is no explanation for why the reefer was turned off or who did it. Nor is there any evidence of a mechanical failure.

{¶ 10} In early January 2018, Halo Top Creamery sent a load of ice cream from the warehouse to a processing company for destruction. According to Halo, this load included the rejected ice cream. Halo filed a cargo-loss claim against TQL for $42,930, the value of

the entire ice cream load. TQL paid the claim by crediting Halo this amount against outstanding amounts that Halo owed TQL. On March 5, 2018, Halo executed a Release and Assignment Agreement assigning TQL all its rights to all claims relating to the transportation of the ice cream, including any claims that it had against Godoy.

{¶ 11} Around the same time, TQL helped file an insurance claim related to the loss with Godoy's insurer. TQL told the insurance company the reason that Walmart had rejected the load, that the temperature was too high, and provided the insurer with the documentation that it requested. In May 2018, the insurer denied the claim on multiple grounds, including that Godoy had failed to cooperate with its investigation and had failed to submit sufficient documentation showing that the reefer unit malfunctioned, a condition for coverage.

{¶ 12} TQL sought indemnification for Halo's cargo-loss claim from Godoy. TQL used its "Standard Form for Presentation of Loss and Damage Claim," dated February 13, 2018, to claim $42,930 for the high temperature issue connected with the ice cream shipment. Included with the claim form were pictures of melting ice cream (the damages) and documents related to the load. TQL obtained $1,900 of the claim amount from Godoy from the amount that it owed him for the ice cream load as well as for prior loads that he had transported and which TQL had not yet paid.

{¶ 13} In April 2018, Godoy filed suit against TQL in a California state court, asserting a lone claim for breach of contract and seeking payment for the ice cream load and for the prior loads for which he had not been paid. In January 2019, the California court, on TQL's motion, dismissed the case based on the forum-selection clause in the Agreement. According to TQL, it incurred $11,888.60 in attorney fees and costs to get the California case dismissed.

{¶ 14} In March 2019, Godoy filed suit in Ohio against TQL. Godoy asserted a claim

for breach of the Agreement based on TQL's failure to pay him for the ice cream load and for prior loads. Godoy also asserted three other claims (trade libel, tortious interference, and deceptive trade practices) based on allegedly false statements that TQL had made to his insurer that Godoy claimed caused his insurance coverage to be canceled, rendering him unable to work for lack of insurance.

{¶ 15} In response, TQL asserted three counterclaims. TQL claimed that Godoy had breached the Agreement by filing suit in California, by failing to obtain a signed delivery receipt, by failing to indemnify it for its customer's cargo-loss claim, and by failing to run the reefer on the proper settings and failing to ensure that the unit remained on. As assignee of Halo's rights and claims against Godoy, TQL also asserted a counterclaim under the Caramack Amendment, based on Godoy's failure to deliver the ice cream in good condition, as well as a counterclaim that he had breached his bailment duties by failing to use due care to deliver the ice cream in good and marketable condition.

{¶ 16} In August 2021, TQL moved for summary judgment on all claims and counterclaims. In its motion, TQL requested that the trial court award it damages of $41,030 for the rejection of the ice cream and damages of $11,888.60 for the cost of dismissing the California suit. TQL also asked the trial court to set a date by which to submit an application for attorney fees and costs incurred in this case. For his part, Godoy argued that a triable issue of fact existed as to whether he was responsible for the rejection of the ice cream load. He contended that the high temperature must have been Walmart's fault. Godoy also contended that the ice cream, though melting, was not damaged but remained in good condition.

{¶ 17} On December 31, 2021, the trial court granted TQL's motion and entered summary judgment for TQL on all claims and counterclaims. The court concluded that the only reasonable conclusion from the evidence was that the rejection of the load was

Godoy's fault. The trial court awarded TQL $41,030 in damages and reasonable attorney fees and costs of $11,888.60. The court said nothing in its decision about TQL's application for attorney fees and costs.

{¶ 18} Godoy appealed.

{¶ 19} In May 2022, while the appeal was pending in this court, TQL moved to dismiss or remand the appeal on the ground that the trial court had mistakenly designated the $11,888.60 award as attorney fees. TQL argued that the amount was actually an award of damages for Godoy's breach of the forum-selection clause. Godoy opposed the motion. Because the parties disagreed as to whether TQL's request for attorney fees had been addressed by the trial court, we remanded the case to the trial court so that the issue could be resolved.

{¶ 20} On remand, TQL filed a fee application and supporting evidence requesting $132,072.26 in attorney fees and costs associated with the Ohio case only. On February 2, 2023, the trial court entered a decision concluding that "the summary judgment decision errantly awarded TQL $11,888.60 for attorney fees." The court then found attorney fees and costs of $66,165.76 was reasonable and awarded that amount to TQL.

{¶ 21} Godoy subsequently filed a motion to amend his notice of appeal to include this attorney-fee decision. But he did not file an amended or supplemental appellate brief challenging the $66,165.76 award.

## II. Analysis

{¶ 22} Godoy assigns three errors to the trial court. The first challenges the entry of summary judgment on TQL's counterclaims and the $41,030 damage award. The second challenges the $11,888 award. And the third assignment of error challenges the entry of summary judgment on Godoy's breach-of-contract claim.

{¶ 23} An appellate court reviews a decision on a motion for summary judgment de

novo, independently and without deference to the decision of the trial court. *Flagstar Bank, FSB v. Sellers*, 12th Dist. Butler No. CA2009-11-287, 2010-Ohio-3951, ¶ 7. Summary judgment is proper when there is no genuine issue of material fact remaining for trial, the moving party is entitled to judgment as a matter of law, and reasonable minds can only come to a conclusion that is adverse to the nonmoving party, construing the evidence most strongly in that party's favor. *See* Civ.R. 56(C); *Harless v. Willis Day Co.*, 54 Ohio St.2d 64 (1978).

{¶ 24} Before considering the assignments of error, we feel there is a need to clarify the issues in this appeal. Godoy does not challenge summary judgment on his claims of trade libel, tortious interference, and deceptive trade practices. The relevant claims in this appeal are the breach-of-contract claim and the counterclaims based on breach-of-contract, the Caramack Amendment, and bailment. In its summary-judgment decision, the trial court did not analyze the counterclaims individually. It gave only this summary conclusion that TQL presented sufficient evidence to support a judgment in its favor on all three:

> Based upon the depositions and affidavits filed with the case, the court finds that TQL has presented sufficient evidence to support a judgment in its favor for breach of contract, for damages under the Caramack Amendment, and for damages for losses on the theory of bailment. However, the court finds that the damages sustained by TQL are the same as to all three areas of the counterclaim and shall be awarded only once.

{¶ 25} Godoy presents the key issue in this appeal as whether a triable issue of fact exists as to his "responsibility" for the rejection of the ice cream load. He contends that whether the high temperature was his fault is a genuine issue of material fact for trial. He further contends that whether the ice cream was in good (or damaged) condition is a genuine issue of material fact for trial. TQL agrees that this is the key issue. TQL claims that if Godoy cannot raise a triable issue of fact as to his "responsibility" for the rejection of the ice cream, his breach-of-contract claim fails. The issue, asserts TQL, is also central to

all parts of its counterclaims.

{¶ 26} We must address how the factual questions of responsibility for the rejection and condition of the ice cream relate to the larger breach-of-contract question. At first, it was not clear what relevance the question of Godoy's fault has to the breach-of-contract claim and counterclaim. The Agreement does use the word "responsible" in several places, but neither party points to a relevant provision that says anything about a carrier's fault with respect to lost or damaged cargo. The answer becomes clear when it is recognized that the word "responsible" has several different meanings. "Responsible" can mean having a job or duty, that is, having the job or duty of doing something or taking care of something, so that one may be blamed if something goes wrong. Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/responsible (accessed Dec. 13, 2023). The word can also mean causing something, that is, being able to be blamed for something because one is the cause. *Id.* When Godoy uses the word "responsible," he intends the second meaning. He is saying that he cannot be blamed—is not at fault—for the high temperature and melting ice cream because he was not the cause. But that is not how the Agreement uses the word. The Agreement uses "responsible" according to the word's first meaning. The Agreement places on the carrier the duty to take care of the cargo such that the carrier may be blamed for any loss or damage—whether or not the carrier was the cause or was at fault.

{¶ 27} Accordingly, there are two key issues in the breach-of-contract claim and counterclaim. Both issues concern the interpretation of the Agreement. The first issue is whether Godoy had a contractual duty to ensure no loss or damage to the ice cream. The second issue is whether Godoy has a contractual duty to indemnify TQL on its customer's loss claim for the ice cream.

### A. TQL's breach-of-contract counterclaim

{¶ 28} The first assignment of error alleges:

{¶ 29} THE TRIAL COURT ERRED BY GRANTING APPELL[EE]'S MOTION FOR SUMMARY JUDGMENT ON APPELLEE'S COUNTERCLAIM AND AWARDING $4[1],030.00 IN COMPENSATORY DAMAGES.

{¶ 30} Before considering the two legal issues that we have identified, we briefly consider the issue decided by the trial court—whether Godoy was at fault for the rejection of the ice cream load.

*Godoy can be blamed for the high temperature and rejection*

{¶ 31} The trial court concluded, based on the evidence, that the only explanation for why the ice cream load was rejected by Walmart was that the reefer was turned off before Godoy arrived at Walmart. The court concluded that Godoy failed to present evidence showing that there was a genuine issue of material fact regarding his fault for the rejection. The trial court was correct that the evidence requires the conclusion that Godoy was responsible for the condition of the ice cream. Viewing the evidence most strongly in favor of Godoy, reasonable minds can conclude only that Godoy was at fault for the temperature problem.

{¶ 32} The evidence shows that Godoy violated his duties under the Agreement regarding temperature. It is undisputed that the ice cream temperature was -20 degrees Fahrenheit when Godoy picked it up from the warehouse. The Rate Confirmation sheet states that the reefer temperature must be -20 degrees and that the reefer should be set on a continuous-temperature setting. In his deposition Godoy admitted that he set the temperature of his reefer at -19 degrees Fahrenheit and that he set it on the cycle-temperature setting. He does not say why.

{¶ 33} The evidence also shows that the reefer was mysteriously turned off at 5:56

p.m., which was shortly after the ice cream had been loaded and well before Godoy arrived at Walmart. The reefer contained a data logger, a "black box" that automatically recorded certain information about the reefer, much like the black box of an airplane records information about a plane and a flight. Trevor McMullen, a representative of the reefer's manufacturer, Thermo King, testified regarding the data logger and the data report generated for the load here. McMullen said that it's a routine process to download data from a reefer. The report generated from the data lists a series of temperatures and an event code for a particular date and time. The times are all stated in 24-hour time, and the temperatures are in Fahrenheit. The temperatures listed include the "Setpoint," the temperature manually set by the driver; "Return," the temperature of the trailer; and "Ambient," the temperature of the outside air. The report shows when the reefer was turned on or off and what mode (e.g., cycle or continuous) it is running in. An entry is made whenever an event occurs or at timed intervals of about one hour.

{¶ 34} The report for Godoy's reefer lists entries beginning at midnight on November 10, 2017, through midnight on November 12, 2017. Here are a few of the key entries:

| Time | Setpoint | Return | Ambient | Event Codes |
|------|----------|--------|---------|-------------|
| 11/10/2017 | | | | |
| 01:26 [a.m.] | -19.0 | 71.7 | 71.1 | Unit Turned On |
| * * * | * * * | * * * | * * * | * * * |
| 07:16 [a.m.] | -19.0 | -28.7 | 65.5 | Null, Diesel, Cycle Sentry |
| * * * | * * * | * * * | * * * | * * * |
| 16:46 [4:46 p.m.] | -19.0 | -19.0 | 62.3 | Null, Diesel, Cycle Sentry |
| 16:54 [4:54 p.m.] | -19.0 | -13.1 | 66.1 | Running, Diesel, Cycle Sentry |
| 17:14 [5:14 p.m.] | -19.0 | -19.0 | 61.3 | Null, Diesel, Cycle Sentry |
| 17:21 [5:21 p.m.] | -19.0 | -13.1 | 64.0 | Running, Diesel, Cycle Sentry |
| 17:56 [5:56 p.m.] | -19.0 | 31.0 | 70.5 | Unit Turned Off |

McMullen confirmed that these entries show that Godoy's reefer was turned on at 1:26 a.m. on November 11, 2017, and that the temperature was manually set at -19 degrees. The temperature of the box was 71.7 degrees, almost matching the outside air temperature of

71.1 degrees. At 4:46 p.m., around the time Godoy arrived at the warehouse to pick up the ice cream, the reefer was still set at -19 degrees and the trailer temperature matched. The event codes show that the reefer was running in cycle mode. Then, at 5:56 p.m., the reefer was turned off. The report shows that it was off all the next day. Godoy denies turning off the reefer, and there is no evidence of a mechanical failure.

{¶ 35} Godoy says that he arrived at Walmart around 8:00 p.m. Two hours later, Walmart told Godoy that it was rejecting the load due to temperature problems. Godoy alleges that the temperature was high because the trailer was left open on the receiving dock. But there is no evidence to support this allegation.

{¶ 36} In sum, what the uncontradicted evidence shows is that Godoy was the cause of the temperature problem and condition of the ice cream. He violated the reefer settings specified in Agreement by setting the temperature higher (-19 degree instead of -20) and using the incorrect mode setting (cycle instead of continuous). Furthermore, Godoy's reefer turned off entirely before he arrived at Walmart. Considering the evidence in a light most favorable to Godoy, we hold that reasonable minds could conclude only that he was at fault for the high temperature.

*Godoy was contractually responsible for the ice cream*

{¶ 37} Regardless of whether Godoy was the cause of the high temperature, he was contractually responsible for any loss or damage to the ice cream. The Agreement placed full and sole responsibility for the cargo on him, as the carrier.

{¶ 38} In Section 8 of the Agreement, Godoy agreed to assume full responsibility and liability for the cargo that he was transporting from the time it was loaded into his trailer until the time he successfully delivered it:

> **8. CARGO LIABILITY AND CLAIMS.** * * * CARRIER is fully
> responsible and liable for the freight once in possession of it,
> and the trailer(s) is loaded, even partially, regardless of whether

a bill of lading has been issued, signed, or delivered to CARRIER. CARRIER's responsibility and liability shall continue until proper and timely delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt evidencing successful delivery.

Also, in Section 22(d), Godoy assumed responsibility for any

damage or loss to the cargo that he was transporting:

**22. GENERAL CARRIER DUTIES.** CARRIER agrees as follows: (*These duties are in addition to any other duties required in this Agreement or in Laws*)

* * *

(d) CARRIER is responsible for any damage or loss to the product, shipment, or its packaging, and any and all shortages, from the time the shipment, or any portion thereof, first comes into CARRIER's possession or control at pickup, until the shipment is no longer in CARRIER's possession or control at delivery.

{¶ 39} In Section 23, Godoy agreed to assume specific duties related to temperature

for refrigerated loads and assumed full responsibility if the products were damaged because

of a variation in temperature:

**23. CARRIER DUTIES FOR REFRIGERATED LOADS.** In order to fulfill CUSTOMERS' delivery and tracking requests, if CARRIER accepts BROKER's tender of a refrigerated load, then CARRIER agrees as follows: (*These duties are in addition to the General Carrier Duties listed above*)

Prior to loading. CARRIER shall confirm that the reefer unit is working properly and pre-cool trailer to the temperature specified on BROKER's rate confirmation. The temperature on BROKER's Rate Confirmation will be in Fahrenheit unless otherwise specified in writing. CARRIER must strictly adhere to the temperature listed on the Rate Confirmation and shall make sure the temperature pulped for the product at loading is reflected on the bill of lading.

* * *

(d) By signing the bill of lading, CARRIER is confirming that the correct product and correct product count were received at the proper temperature. CARRIER is solely responsible for cargo

loss or damage incurred related to discrepancies in product information between the bill of lading, Rate Confirmation, and the actual product. * * *

(e) CARRIER shall continuously maintain the temperature noted on BROKER's Rate Confirmation from pickup at shipper until delivery at receiver. CARRIER shall not, at any time, set reefer on start/stop, cycle, or any other non-continuous temperature setting unless otherwise notified in writing by BROKER. * * *

**{¶ 40}** The Agreement placed on Godoy the duty to take care of the cargo such that he could be blamed for any loss or damage, whether or not he was the cause or at fault. Godoy was entirely and solely responsible for the ice cream from the time it was loaded until it was successfully delivered. As a matter of law, then, Godoy was contractually responsible for any loss or damage to the ice cream.

*Godoy had a contractual duty to indemnify TQL*

**{¶ 41}** Parties "have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced." *Nottingdale Homeowners' Assn., Inc. v. Darby*, 33 Ohio St.3d 32, 36 (1987). Indemnity "is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement." *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 240 (1987). The Ohio Supreme Court has explained:

> Express indemnity * * * is based on a written agreement or contract in which one party (the indemnitor) promises to indemnify another party (the indemnitee) for payments it makes under circumstances set forth in the agreement or contract. *See Worth* at 240. And the nature of the indemnity relationship is determined by the intent of the parties, as expressed by the language used in the agreement or contract. *Id.* When the indemnitor expressly agrees to indemnify an indemnitee, the indemnitor is obligated to do so under the terms of the agreement or contract. *Allen v. Std. Oil Co.*, 2 Ohio St.3d 122, 443 N.E.2d 497 (1982), paragraph one of the syllabus. Therefore, when parties have entered into an agreement or contract that includes an indemnification clause, unless that clause is ambiguous or otherwise unlawful, it will be applied as written because the agreement or contract governs the rights of the parties.

*Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, Slip Opinion No. 2023-Ohio-3398, ¶ 17.

{¶ 42} Under the Agreement, Godoy agreed to indemnify TQL for any claim for loss or damage to the ice cream. The indemnification provision in Section 10 of the Agreement provides:

> **10. <u>INDEMNIFICATION.</u>** CARRIER agrees to defend, indemnify, and hold BROKER * * * harmless from and against any and all claims or liability * * * arising out of or in any way related to CARRIER's negligence, willful misconduct, acts, omissions, or performance or failure to perform under this Agreement, including, without limitation, claims or liability for cargo loss and damage * * *.

We previously considered this indemnification provision in a case very similar to the present one, *Total Quality Logistics L.L.C. v. JK & R Express L.L.C.*, 12th Dist. Clermont No. CA2022-02-005, 2022-Ohio-3969. And we concluded this provision unconditionally requires a carrier to indemnify TQL, even for voluntary payment of a customer's loss claim. It is worth examining this case in some depth.

{¶ 43} The basic facts of *JK & R Express* are fairly straightforward. TQL's customer contracted with TQL to transport a load of apples. TQL arranged for a carrier to provide the transportation service. The apples were destroyed when the trailer caught fire enroute to delivery. TQL's customer submitted a loss claim to TQL for the value of the load of apples, and TQL paid the claim by offsetting the amount from the customer's unpaid invoices. The customer signed a release and assignment agreement, releasing TQL from liability and assigning to TQL all claims and causes of action that it had against the trucking company. The evidence showed that the payment of the loss claim was voluntary, a business decision that TQL made to maintain its business relationship with the customer. TQL notified the trucking company of the claim and requested payment, submitting its Standard Form for Presentation of Loss and Damage Claim. The trucking company refused to pay.

{¶ 44} TQL sued the trucking company for breach of contract for failure to indemnify or, alternatively, unjust enrichment and promissory estoppel. TQL offset the amount that it had paid its customer with the amount that it owed the trucking company on unpaid invoices and sought that amount as damages for the breach. Both parties moved for summary judgment. The trucking company argued that it was not obligated to indemnify TQL because TQL had not been compelled by contract or court judgment to pay its customer's loss claim. Because TQL had no obligation to pay for the loss, said the trucking company, TQL had voluntarily settled the claim merely as a business consideration and therefore failed to satisfy a common-law indemnification requirement.[1] The trial court granted summary judgment for the trucking company on the breach-of-contract claim, and TQL appealed.

{¶ 45} The primary issue on appeal was whether, under the Broker-Carrier Agreement in *JK & R Express*, the parties intended to require the trucking company to indemnify TQL for a voluntary settlement of a customer's loss claim. We first concluded that the law did not require TQL to pay its customer for the cargo loss. We stated that cargo damage claims against an interstate motor carrier are determined under the Caramack Amendment, which places the risk of cargo loss solely on the carrier, but that Amendment did not specifically govern shipping brokers like TQL. We also found no evidence that TQL's contract with its customer obligated it to pay for the loss.

{¶ 46} The indemnification provision in Section 10 of the *JK & R Express* Agreement in the case pertinently provided:

> CARRIER agrees to defend, indemnify, and hold BROKER * * *
> harmless from and against any and all claims or liability * * *
> arising out of or in any way related to CARRIER's negligence,

---

1. The common law imposes requirements for determining whether an indemnitee may recover against an indemnitor when the indemnitee has settled a claim without the indemnitor's involvement. *See Globe Indemn. Co. v. Schmitt*, 142 Ohio St. 595 (1944).

willful misconduct, acts, omissions, or performance or failure to perform under this Agreement, including, without limitation, claims or liability for cargo loss and damage * * *

This provision, we said, explicitly provided that the trucking company was obligated to indemnify TQL for any and all claims or liability for cargo loss. The evidence showed that TQL's customer asserted a claim for cargo loss. Therefore, we concluded, TQL was subject to a "claim" for cargo loss that arose out of the trucking company's failure to perform under the Agreement, i.e., its failure to deliver the apples.

{¶ 47} We concluded that it was irrelevant that TQL paid the loss claim voluntarily. Section 8 of the Agreement placed the risk of cargo loss solely on the trucking company as the:

> * * * CARRIER is fully responsible and liable for the freight once in possession of it, and the trailer(s) is loaded, even partially, regardless of whether a bill of lading has been issued, signed, and/or delivered to CARRIER. CARRIER's responsibility/ liability shall continue until proper and timely delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt evidencing successful delivery. * * *

We also looked at Sections 8(d) and (e), which provided:

> 8(d). Except as provided in this Agreement, all liability standards, time limitations, and burdens of proof regardless of whether CARRIER has common or contract Operating Authority shall be governed by common law applicable to common carriers and by the Caramack Amendment codified in 49 U.S.C. § 14706. CARRIER agrees to accept notice of a claim in the form issued by BROKER, including electronic or facsimile transmission.

> 8(e). Notwithstanding the terms of 49 C.F.R. § 370.9, CARRIER shall acknowledge a claim within 30 days of receipt, and pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 60 days from the receipt of the claim. Failure of CARRIER to pay, decline, or offer settlement within this 60-day period shall be deemed an admission by CARRIER of full liability for the amount claimed and a breach of this Agreement. Notwithstanding any other provision in this Agreement, BROKER reserves the right to offset any claim(s) with CARRIER'S pending invoices.

We concluded that these sections made the trucking company exclusively liable for any cargo loss or damage. We specifically noted that Section 8(e) allowed TQL to offset cargo-loss claims with a carrier's unpaid invoices. We noted this showed that the parties intended to require the trucking company to indemnify TQL for any loss claim asserted by a customer.

{¶ 48} We declined to read into the Agreement a condition that a carrier's duty to indemnify TQL for a cargo-loss claim did not arise if TQL paid the claim voluntarily. The duty to indemnify for cargo-loss claims in Section 10, we said, must be read in the context of the entire Agreement.[2] We stated that the Agreement, considered as a whole, was designed to make TQL the single point of contact for its customers and carriers and to prevent interaction and communication between customers and carriers. The Agreement was also intended to make TQL solely responsible for the transportation of its customer's cargo, which included the resolution of cargo claims without involving either the shipper or the customer.

{¶ 49} In sum, we concluded that Section 10 plainly and unconditionally entitled TQL to indemnification from a carrier for "any and all claims." This broad phrase was not limited or modified nor was there any language excluding voluntary payments or settlements. Therefore we concluded that TQL's voluntary payment to its customer qualified as a "claim" that the trucking company was obligated to indemnify.

{¶ 50} The pertinent language related to the indemnification duty in Sections 8 and

---

2. We pointed out that the Agreement also provided: (1) the carrier is fully responsible and liable for the cargo once in possession of it and until it is properly and timely delivered; (2) the carrier looks only to TQL for payment and agrees to neither contact nor seek payment from TQL's customers; (3) the contact between the carrier and shipper is limited to "the minimum level of contact necessary to perform the services"; (4) in the event a claim arises, the carrier agrees to accept notice of the claim from TQL, as opposed to a shipper or customer, and agrees TQL has the right to offset any claim with the trucking company's open invoices with TQL without any exception; (5) the carrier agrees to indemnify TQL and its customers for any and all claims for cargo loss and damage arising out of or relating to the carrier's performance or failure to perform; and (6) the only limitation on indemnification is when a claim or liability arises directly and solely from the negligence or willful misconduct of TQL or another party, not the carrier.

10 of the Agreement in *JK & R Express* is identical with the language in those same sections of the Agreement in the present case. Moreover, the factual situation in *JK & R Express* is very similar also. Like here, TQL's customer submitted a cargo-loss claim to TQL for the value of a load, and TQL paid the claim. Like in *JK & R Express*, TQL was not compelled to pay its customer's loss claim. TQL sought indemnification from the carrier for the amount that it had paid (after offset), and the carrier refused to pay.

{¶ 51} Based on our reasoning and conclusions in *JK & R Express*, we conclude that Godoy is obligated to indemnify TQL for its customer's loss claim. Under the Agreement, Godoy was entirely and solely responsible for the ice cream until he successfully delivered it to Walmart. He did not deliver the ice cream successfully. Walmart rejected the entire load because the temperature was high. It is irrelevant who was at fault for the high temperature. TQL's customer asserted a loss claim against TQL for the value of the entire load, which TQL paid.

{¶ 52} Godoy cites evidence that some of the ice cream that Walmart rejected was refrozen and later resold. There is evidence in the record that after Walmart rejected the load Godoy brought the ice cream back to the warehouse where it was put back in the freezer. Halo, TQL's customer, had the ice cream put on "hold" while samples were tested at a lab. A few weeks later, Halo received word from the lab that a third of the refrozen ice cream was clear. This ice cream was released back into inventory and subsequently sold to other retail stores. The rest of the refrozen ice cream was destroyed. This evidence suggests that Halo recovered some of the value of the Walmart load.

{¶ 53} Yet the loss claim that Halo submitted to TQL—and TQL paid—was for the entire value of the Walmart load. The evidence does not give a clear answer for this apparent discrepancy. TQL's designated representative, Marc Bostwick, hints at reasons in his deposition. Bostwick said that he did not know that some of the ice cream had been

resold. According to Bostwick, TQL paid the loss claim likely because Halo had told TQL that it was not going to pay $42,930 in outstanding invoices that it owed. This suggests that TQL, like it did in *JK & R Express*, paid Halo's loss claim because it wanted to keep Halo as a customer. No doubt TQL was also thinking about its reputation as a shipping broker. It also stands to reason that TQL might have expected that it would be able to recover the amount from Godoy's insurer. The evidence suggests, then, that TQL simply saw paying the entire loss claim as a cost of doing business.

**{¶ 54}** Regardless, as we concluded in *JK & R Express*, TQL's reasons for paying a customer's loss claim are irrelevant to the indemnification duty under the Agreement. In Section 10 of the Agreement, Godoy agreed that he would indemnify TQL from any claim for loss. Godoy's indemnification duty is not limited to actual loss or loss involving damaged goods. TQL's customer presented TQL with a claim for loss that was related to Godoy's performance under the Agreement. Godoy is obligated to indemnify TQL for that claim. When he refused to indemnify TQL, Godoy was in breach of the Agreement. As a matter of law, Godoy has a duty to indemnify TQL for the entire claim.

*TQL properly offset the amount that it owed Godoy*

**{¶ 55}** TQL properly offset the amount that Godoy owed it with the amount that it owed Godoy. Section 4(g) of the Agreement allows TQL to offset cargo loss claims with Godoy's open invoices with TQL:

> **4. COMPENSATION.** * * * Additionally:
>
> * * *
>
> (g) Notwithstanding any other provision in this Agreement to the contrary, BROKER may offset against CARRIER's pending invoices for any amounts due to BROKER, including, without limitation, those arising from or related to cargo claims, CARRIER'S breach of this Agreement, or CARRIER's indemnity obligations to BROKER or CUSTOMERS.

{¶ 56} The only major difference between the pertinent Agreement provisions in *JK & R Express* and those here is the offset provision. In *JK & R Express*, that provision was found in the last sentence of Section 8(e); here, it is in Section 4(g). Also, the provision has been expanded in the current version of the Agreement and broadens TQL's right to offset. Here, TQL essentially did the same thing with respect to the offset that it did in *JK & R Express*, where we found that TQL had the right to offset the claim against invoices it owed to the carrier.

{¶ 57} The evidence here shows that Godoy had pending invoices that totaled $1,900. Offsetting the amount that TQL paid for the loss claim ($42,930) with the pending invoices leaves a net balance due TQL of $41,030, which is the amount that the trial court awarded TQL. We see no error. As a matter of law, TQL's offset was proper under the Agreement.

{¶ 58} Godoy was obligated to indemnify TQL for the claim against it. The evidence shows that TQL fulfilled its contractual obligations, Godoy failed to fulfill his contractual obligations, and TQL incurred net damages of $41,030 as a result. There is no issue of fact for trial, and TQL is entitled to judgment as a matter of law. Because TQL is entitled to full relief based on its breach-of-contract counterclaim, we need not address its other two counterclaims under the Caramack Amendment and breach of bailment.

{¶ 59} The first assignment of error is overruled.

**B. Godoy's breach-of-contract claim**

{¶ 60} Next, we will address the third assignment of error out of order, where Godoy alleges:

{¶ 61} THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN APPELLEE'S FAVOR ON APPELLANT'S BREACH OF CONTRACT CLAIM.

{¶ 62} Godoy argues that TQL breached the Agreement in several ways by: (1)

terminating the Agreement and refusing to tender freight for transportation; (2) refusing to pay Godoy for the Walmart load; (3) refusing to pay Godoy for prior transported loads; (4) refusing to hire Godoy to provide transportation services; and (5) failing to pay Godoy's invoices, fees, and costs.

{¶ 63} With regard to his second breach-of-contract claim above, TQL's duty to pay Godoy for the Walmart load never arose. As we have concluded, Godoy violated the Agreement in a way that caused TQL damage. In addition, he failed to satisfy an express condition to payment. Section 4(b) of the Agreement states:

> **4.** **COMPENSATION.** CARRIER agrees to perform the Services for BROKER, under CARRIER's Operating Authority exclusively, at a rate mutually agreed upon in writing in a TQL Rate Confirmation ("Rate Confirmation"), which shall be incorporated into this Agreement, or by Electronic Communications (defined in Section 20). Additionally:
>
> * * *
>
> (b) As a condition to payment, CARRIER shall submit complete and legible invoices, clean bills of lading, and signed loading or delivery receipts for all Services.

Godoy did not submit signed loading or delivery receipts for the Walmart load.

{¶ 64} As for the other alleged breaches, as we discussed above, TQL properly offset the amount that it was entitled to under the indemnification provision with amounts that it owed Godoy for prior transportation services. Finally, Godoy fails to convince us that the Agreement obligated TQL to hire him to perform transportation services.

{¶ 65} There is no issue of fact for trial on Godoy's breach-of-contract claim, and TQL is entitled to judgment as a matter of law. Therefore, the trial court properly entered summary judgment for TQL on this claim.

{¶ 66} The third assignment of error is overruled.

## C. Attorney fees

{¶ 67} Turning now to the second assignment of error, Godoy alleges:

{¶ 68} THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN APPELLEE'S FAVOR AND AWARDING $11,888 IN ATTORNEY'S FEES.

{¶ 69} Godoy argues, on page 15 of his brief, that "the trial court erred when it awarded TQL attorneys' fees without first identifying the lodestar or requiring TQL to submit an affidavit attesting to the reasonableness of the alleged award." TQL disagrees, claiming that the initial award of $11,888.60 was actually for damages pursuant to its separate breach-of-contract claim against Godoy for filing suit in California in violation of the Agreement's forum-selection clause, which clearly required any dispute between the parties to be brought in Ohio. The amount of the award, says TQL, reflected the attorney fees and costs that TQL incurred to obtain a dismissal of the California lawsuit. In the alternative, TQL argues that even if the award was not for damages but for attorney fees, it submitted an affidavit setting forth the amount it sought to recover and there was ample evidence in the record setting forth the legal work performed in defending the California lawsuit.

{¶ 70} While this appeal was pending, TQL moved to dismiss the appeal because the issue of attorney fees was still outstanding with respect to the fees it incurred in the Clermont County, Ohio, litigation. Alternatively, TQL requested that we remand the case for the trial court to address the pending issue of attorney fees. Godoy opposed dismissal or remand of the case and countered that the trial court already had addressed TQL's request for attorney fees by awarding it $11,888.60. Since there was confusion as to the classification of that award and whether the motion for attorney fees was still pending before the trial court, we remanded the matter. In our remand entry, we stated:

> It is evident that there is a disagreement between the parties
> with respect to whether TQL's motion for attorney fees has been
> addressed by the trial court. If the motion for attorney fees had

not been addressed, which is TQL's argument here, App.R. 4(B) requires that this appeal be remanded so that this issue can be resolved by the trial court. Judicial economy will be best served if this case is remanded. If the designation of the $11,888.60 attorney fees was an error, the error must be corrected and TQL's request for attorney fees addressed. If the $11,888.60 was in fact an award of attorney fees due to TQL, that should be made clear so this appeal can proceed to conclusion.

{¶ 71} On remand,[3] TQL filed affidavits in support of its motion for attorney fees. The trial court held a hearing at which counsel for the parties argued their positions on the record. After the hearing, the trial court took the matter under advisement, and on February 2, 2023, the court rendered its "Decision/Entry." The trial court acknowledged that it was "tasked with determining whether it made an error in awarding attorney fees in its summary judgment decision, and if so, determining the correct attorney fees award." After reviewing the record, the court noted that at the time summary judgment was granted to TQL, the court had not yet received a fee application from TQL nor held an evidentiary hearing on this issue. The court then considered the submitted evidence and determined that TQL was entitled to $66,165.76 for attorney fees. The trial court did not award TQL a separate amount of $11,888.60 for damages, as TQL implied.

{¶ 72} It is clear that, on remand, the trial court deemed the $11,888.60 award as an award for attorney fees only. The court stated in its decision that "[i]t appears to the court that the summary judgment decision errantly awarded TQL $11,888.60 for attorney fees." In sum, then, on remand, the trial court found that the $11,888.60 award was in error and awarded attorney fees in the amount of $66,165.76. Therefore, this results in Godoy's second assignment of error being moot, and it need not be considered.

---

3. Judge McBride presided over the case up to the point of the summary-judgment decision in question. At some point after entering that decision, Judge McBride retired from the bench. Judge Miles replaced Judge McBride and presided over the remand proceedings and decided the attorney-fee matter in this case.

## III.  Conclusion

**{¶ 73}** The judgment granting TQL summary judgment is affirmed.

PIPER and BYRNE, JJ., concur.